Good morning. May it please the Court, I'm Charles Nickel appearing for the petitioner, it's Ramos Mejia. This is a Guatemalan asylum case in which the main contested issues are the standard for assessing credibility and whether the immigration judge correctly determined that there was an abandonment of petitioner's claim to asylum for having returned to Guatemala for a two-week period. The petitioner's testimony, if deemed credible, presents a very strong case for a grant of asylum on humanitarian grounds based on past persecution. The petitioner provided very detailed testimony of how in 1987, at the age of 15, he was forced to witness the public execution of his cousin and a friend by guerrilla forces because they had allegedly provided information on the guerrillas to the Guatemalan army. Two of petitioner's uncles were murdered by the guerrillas for having refused to comply with their demands, and the petitioner saw their bodies and how they had been killed. Petitioner was himself confronted by the guerrillas in 1990 when he was 18, and he was threatened with death for having refused to align himself with their cause. Under the BIA's holding in matter of Chen and this Court's holding in Lopez Galarza v. INS, asylum may be granted on humanitarian grounds where atrocious forms of persecution have been suffered by the applicant or by family members. The petitioner fled Guatemala in 1990 in an attempt to find safety in the United States. He was detained by the U.S. Border Patrol and was questioned as to whether he had been a member of the guerrillas or if he had killed anyone. He did not at that time understand the concept of asylum, and he feared he would be beaten if he did not agree to return to Guatemala, and therefore he agreed to be returned. He spent only hours in Guatemala and immediately traveled to Mexico and eventually reentered the United States in 1992 and applied for asylum in 1993. In 1999, when his asylum application was pending, petitioner received information that his mother was seriously ill and near death in Guatemala. A petitioner discussed this matter with his prior counsel and was informed that an asylum applicant should not depart the country. Nevertheless, he decided that he had to visit his mother before she died. He spent two weeks in Guatemala visiting his mother, and upon attempting to reenter the United States, he was detained by the Border Patrol. Out of fear that he would be deported to Guatemala, he gave  up his asylum. Counsel, the heart of the decision by the immigration judge is that because in his original testimony to the immigration court, your client falsely stated a number of things related to his claim. For example, that he had never left the U.S., never gone to Guatemala or Mexico  things that he did not tell the truth about until pushed. Why isn't that a sufficient ground for an immigration judge to disbelieve him? It isn't necessarily required that he be disbelieved, but why isn't it permissible? Well, he made false statements about one issue, and that was his departure in 1997 and his attempt to return. And the reason it's not a basis is because this Court in Tercios v. INS and in Akinmaid v. INS has held that false statements regarding one's identity and nationality to an official in the United States are not in themselves a basis to deny asylum.  I'm sorry. Go ahead. I thought that this was a question of credibility. You catch the guy lying once, how many times do you have to get, you know, burned? Well, but it depends upon what he – I mean, it doesn't – perjury certainly doesn't help his case. But it's not always – and it injures, but it's not necessarily fatal. What is – what would be fatal is if there was a contradiction in the testimony regarding the basis of what happened to him in Guatemala. The judge didn't find that. The judge said that she found him to be a very – that his testimony appeared very sincere, extremely detailed. And when the revelation came out about the fact that he departed to see his mother and came back and didn't tell anyone because he feared that that would be the end of his claim. But doesn't it bear on his claim, because it bears on whether he would be in fear in Guatemala since he had been willing, even though for a serious reason, had been willing to go back there and was not harmed during that period? Doesn't that bear on the – on his claim? It does bear on the claim, but, you know, under ACFR 1208.A, there is a presumption that someone who goes back – who departs from the United States has abandoned their claim to – to asylum. And if they go back to their – to their country where they claim persecution, there's a presumption, but there's nothing that's not a rebuttal. I'm not talking about abandonment. No, that's not my point at all. Your argument seemed to be that this was not an important matter that he had lied about. And I guess that's what I was questioning. Doesn't his ability to return to Guatemala without harm have a relationship to whether or not he would reasonably be afraid in the future of persecution having to do – in other words, why isn't that an important lie rather than an unimportant lie? It does matter. It doesn't go to the heart of the issue of past persecution in humanitarian grounds, because what happened in the past, you can still grant asylum even if there's been a total change of country conditions. In terms of – but you have to look at the facts. I mentioned in the brief that the asylum officer's own code for assessing asylum cases talks about where someone goes back, you presume there's – they're basically saying that things are okay. But if they come to the interview and they give their testimony, you have to take the reasons for the departure into effect and determine how it affects the merits of the asylum application. And here it was for a very specific purpose. He did not – he went back, visited his mother in the hospital, he saw family members, and he immediately departed. He basically, you know, did not go out and – and returned as quickly as he could. He's claiming a fear of persecution in Guatemala. Now, he doesn't know whether that's going to be as soon as he returns or whether people, you know, find out about his presence. He stayed no longer than was necessary and immediately returned to the United States. I don't think that that is a – something that – which would necessarily defeat his fear of persecution. And it goes to, you know, the issue of when he – he didn't tell about that. It's again going to the issue of whether or not he fears that – there are two types of misrepresentations, one where you are going to be sent back to the country, and the other that goes to the basis of your asylum claim. And his failure to disclose this is not something that really undermines his other testimony. The immigration judge did also say that she couldn't view asylum because she said, well, it appears that there's an abandonment, and I don't know if there's any exception to that because of the – of the presumption. Well, a presumption is something which you don't know to be true or to which there may be exceptions. A presumption invites the possibility that there are exceptions. And in this case, his reason for going back was certainly not something that would defeat a claim to asylum. There are two cases. Neither of them were in the Ninth Circuit, but the – the – in the government's brief, they cited two cases, Del Burbuno v. Ashcroft, which is a Fourth Circuit case, and Marquez v. INS. One was the Fourth Circuit case. The person went back to Guatemala to obtain medical services, and – which he could have obtained in the United States, and the court said, well, this appears that you've got a reasonable reason. It's not compelling. Marquez went back to the Philippines for extended periods of time over the eight years between his asylum claim and his adjudication. Here, the Petitioner did not want to return to – to Guatemala. He received information that his mother was deathly ill. What is there that indicates that he – that he faces a threat of persecution now? Because for over six years, people came by his home. And the last time they mentioned it, they talked about 96. They talked about 96. But at least it was – that there was an ongoing interest from 1990 until 1996 over a six-year period. His claim is that the people are still there, that – and that they have a motive to harm him. Also, in this Court's case in Thomas last year, they discussed about family-based persecution, that persecution of close family members is indicative of a fear of persecution. The last time it was that a family member was hurt was in 1996. The last time that people came looking for him? Yeah. When was the last time a family member was? That would have been, I believe, 89, the last time they were killed. Thank you. You have used your time. Thank you. Good morning, Your Honors. May it please the Court. My name is Alison Drucker. I'm representing the United States. As this Court appears to recognize, it's axiomatic that an alien applying for asylum and withholding must offer credible testimony, and the applicant must also show subjective and objective fear. The immigration judge found that the petitioner did not adequately make these showings and denied relief. This Court can only reverse if it finds that the evidence compels a different result, and it simply does not. I think the Court has already gone over the facts that the petitioner lied about, going back to Guatemala and staying there unharmed. Now, this goes to the heart of his claim. What could be more at the heart of an asylum claim than the questions of subjective and objective fear? If a person goes back to the country where they claim they're going to be killed, that certainly bears on whether they're really afraid. And the fact that they stay there and nothing happens to them certainly bears on the question of whether any fear that they could conceivably have would be objective or not. Petitioner was not in any kind of immediate danger when he was lying repeatedly and under oath to the asylum officer and then in immigration court to the immigration judge. Not only that, but his own psychological evaluation says that his memory is intact. This is at AR 607. So this – there's some discussion, I think, in the briefs about, you know, whether he was a victim of stress syndrome, but – post-traumatic stress syndrome, but if so, even the – his own expert doesn't seem to think that that affected his memory. So that has nothing to do with his falsehoods, which seem to have been deliberate because he realized that if he told the truth, it would be bad for his asylum claim. Now, that goes – that issue, the credibility, goes to both asylum and withholding. Also going to asylum is this question of a presumption of abandonment. Now, the regulation at 208.8, which is quoted in the government's brief at page 18, there's some question about whether both parts of the presumption allow for some rebuttal or giving reasons, but certainly at least the part about going to the country of claim and persecution does mention a compelling reason. Now, compelling is a pretty strong and high burden. Petitioner here testified that his mother was ill and that he went home to see her fearing that she might die. However, the immigration judge reasonably concluded that since all there was about this in the record was the Petitioner's own testimony, and the Petitioner, as an admitted perjurer, had damaged his credibility himself so badly, the immigration judge was not prepared to accept this explanation without some sort of corroboration. Now – about his reason about going back because he went back to see his mother, who was very ill, that puts him in a pretty conflicted situation because he doesn't want people to know that he went back, but there's no question that his – there's no – you're not questioning that his mother was critically ill. We don't know. I mean, all we have is his word for it. No. So, yes, I think the immigration judge was questioning that, that we have only his word for why he went back, how long he was back, what he did while he was back. We don't have any way of evaluating any of that, and he's a confessed perjurer. So why should we believe him? That was the immigration judge's reaction to all this, which seems at least logical. And certainly, given all that, I don't see how you could say a different result is compelled by the record before you. Well, suppose that we – just suppose we're willing to accept that we were to disagree with you on the credibility and assume that he's credible. I take it that you would still argue that he's not entitled to any relief? Yes. We would still say that because of the presumptions in the regulation, there's the two parts. I mean, the first one says if you don't have advance parole, there's a presumption that locks him in the first place. And that part of the regulation doesn't even, you know, say anything about compelling reasons. So there's certainly a question as to whether that can be rebutted, particularly since the So is it your position that even if it was true that someone took a brief trip to visit a very sick parent, that that's not a good reason? It's not a compelling reason? It's not clear that that's sufficient for leaving without advance parole. Under the regulations, you're supposed to get advance parole to go anywhere outside the United States if you're an asylum applicant. Now, the second part is going to the country where you claim fear. Now, that provides for the compelling reason aspect. But again, yeah, if you show that you have a compelling reason. Now, in most cases, if someone was considered credible and they gave an explanation, that the immigration judge might well accept that as sufficient and it would be compelling. But in this particular case where you've got a self-confessed perjurer in front of you, I just don't see why the immigration judge should be, you know, compelled by the standard to accept that. I mean, when somebody lies repeatedly under oath, you don't believe them. I just want to understand what we have to decide and what we don't have to decide. If we were to say that he is credible or that we should, that we believe that he went back for a very compelling reason and it was brief and that we should disregard that absence, what is your position? Well, that would settle the, or I shouldn't say settle, that would mean that on the asylum part of the claim, I think you would need to remand because it seems clear from the immigration judge's analysis that he didn't think that there was enough evidence in the record, even if credible. He says this very specifically in the decision about past persecution and well-founded fear. But I don't believe that the IJ decision actually reached that for asylum. However, on withholding, the immigration judge did definitely address that aspect. The immigration judge said that aside from credibility, another reason why the Petitioner was not eligible for withholding was he couldn't show that it was more likely than not that he would be persecuted. And the reasons for that are, oh, and excuse me, I should also just back up for a second and say that this, on the asylum, there's also this matter of Chen issue that's arisen. I really don't think that anything that happened to him rises to that level. Matter of Chen is a really extreme case where, you know, somebody is trying to make a claim that somebody was, like, basically, like, put in a closet and starved and saw his father burn to death. And it's just really horrendous stuff. Here, okay, some relatives apparently were killed. At least that's what he says. Again, who knows. But even if that's true, there's nothing to show in the record that these deaths or harms were connected to Petitioner himself in any way. All we know about Petitioner is supposedly he was threatened several times, you know, verbally. And that's hardly enough to come under matter of Chen. But anyway, to get back to the more likely than not, so very little physical harm, if any, happened to him before he came to the United States. The last time he said anybody was looking for him was in 1996, which was the year of the Peace Accords. That's in Administrative Record 122. And Petitioner's brief mentions extrajudicial political killings in Guatemala, citing to Administrative Record 183. But if you look at that, after the statement about these killings, there's five or six paragraphs with examples. Katzla, I think we can read it, and your time is up.  You don't have any time left, but if you feel compelled to answer something, we gave you your adversary 11 extra seconds if you want to make a closing sentence, you may. Yeah. I think that if the government intended to write an ironclad regulation that precluded an asylum — an applicant from going forward on an asylum application for having returned to his country of claimed persecution, the word presumption would not appear in it. They could simply say that one is not eligible to go forward on the application. By using the word presumption, that indicates there is an exception. As far as the matter of Chen, the majority of the harm in that decision happened to Chen's father, although there was severe persecution also of Chen. But clearly, it indicated family members. Harm to family members is something that must be evaluated. It was extreme. And having to be forced to watch the execution of family members is also extreme. I think for a 15-year-old to be called out into the square and for his cousin and friend and that these people are going to be killed in front of you, that's extreme. Seeing your uncle stabbed and shot is also extreme. Thank you. Thank you.
judges: Schroeder, Graber, Duffy